**REED v. HARDT et al.**

No. 8276.

Circuit Court of Appeals, Third Circuit.

Argued May 21, 1943.

Decided Aug. 20. 1943.

W. Heyward Myers, Jr., of Philadelphia, Pa. (Arthur Littleton and Morgan, Lewis & Bockius, all of Philadelphia, Pa., on the brief), for appellants.

Allen S. Olmsted 2d, of Philadelphia, Pa., for Federal Deposit Ins. Corporation.

Angelo L. Scaricamazza, of Philadelphia, Pa. (Thomas J. Minnick, Jr., of Philadelphia, Pa., on the brief), for appellee.

Before BIGGS, MARIS, and WOODBURY, Circuit Judges.

WOODBURY, Circuit Judge.

From the stipulation of facts entered into by counsel in this case it appears that on October 1, 1930, one Pearlman and his wife executed a trust agreement in which they agreed to transfer certain of their assets to the appellant Hardt, as trustee, for prompt liquidation and equal and ratable distribution among their creditors. Reed, the appellee, is the duly appointed receiver of a successor to one of Pearlman's creditors, a national bank, which had participated in this trust agreement.

In the trust instrument Hardt was given broad general powers of administration over the trust estate. He was given "as full power and authority concerning the same as he would have if he were the absolute owner thereof", and "Without limiting the generality of the foregoing" he was specifically given the power "To borrow money[1] as Trustee and to pledge any item or items constituting directly or indirectly part of the Trust Estate, for any purpose connected with the management of the trust which he may deem proper." He was also given power "To transfer to the name of Trustee or of his nominee any item or items constituting directly or indirectly part of Trust Estate."

One of the assets assigned and transferred to Hardt according to the terms of the trust agreement was a policy of insurance on Pearlman's life written in the sum of $100,000 by the Sun Life Assurance Company of Canada, and in the trust agreement it was specifically provided that Pearl-

---

[1] It was provided in the instrument that "Loans may be made by any creditor or creditors."

man's failure to pay any premium on this policy as it fell due should constitute an "event of default". With respect to events of default the trust instrument provided: "In addition to any and all other rights and privileges herein given to Trustee, Trustee shall have the right at any time in case of an event of default as herein defined, to expose the Trust Estate, or such part thereof as then remains undistributed, at public or private sale, with or without notice to Pearlman or Mrs. Pearlman, and sell the same for the best price obtainable thereat, and Trustee shall have the right representing such of Creditors as wish to join therein, to purchase the same or any part thereof without any equity of redemption on the part of Pearlman and/or Mrs. Pearlman."

It appears that at some time subsequent to the assignment and transfer of the life insurance policy to Hardt as the trust agreement required, Pearlman stopped paying the premiums due thereon, and, in order to reinstate the policy without a medical examination of the insured, it became necessary under the terms of the policy that a premium thereon be paid by February 4, 1934. Faced with this situation it was agreed by all of the creditors who were parties to the trust agreement that the policy should be reinstated and that the necessary premiums should be paid by the trustee from funds contributed therefor by each of the creditor parties in the proportion that each of their claims bore to the total of all claims. Accordingly the trustee paid the premium and each of the creditors, including the appellee's predecessor, contributed its proportionate share thereof.

In order to reinstate the policy again without a further physical examination of the insured, it became necessary to pay another premium on or before May 4, 1936. In anticipation of this premium date Hardt, the trustee, called a meeting at his office for April 14, 1936, of all the creditors who had participated in the trust agreement for the purpose of discussing a policy with regard to Pearlman's life insurance. Reed's predecessor was duly notified by letter of this meeting and of its purpose but neither he nor any representative of his attended. A majority of the creditors, however, did attend and at it, according to the stipulation of facts: "It was agreed by all of those present that the said policy should be reinstated by the payment of the necessary premium of $9,799.19 on May 4,

1936, and that the cash therefor should be secured as before by contributions from each of the creditor parties in the proportion that each of their claims bore to the total of all claims. It was further agreed that if any one of the creditor parties should not contribute its proportionate part of the premium, the other parties would pay the share of the defaulting party and thereafter the defaulting party's interest in the policy would consist only of its portion of the then existing cash surrender value of the policy, and that this would not be paid to the defaulting party until the death of the insured."

The trustee promptly notified the receiver by mail of the above action taken by the creditors and asked the receiver "whether or not you desire, on behalf of the Commercial National Bank, to contribute its pro rata share of the cash needed to reinstate the policy of the Sun Life Assurance Company of Cananda." The trustees paid the premium which fell due on May 4, 1936, and on July 28, following, the receiver informed the trustee by letter that the Comptroller of the Currency "instructs us we are to make no advance of Trust Funds for payment of these premiums." Consequently the bank's pro rata share of the premium was paid by the other creditors in accordance with the agreement reached by them at the meeting of April 14, 1936.

On July 15, 1938, the trustee wrote the then receiver for the bank that another meeting of Pearlman's creditors would be held at his office on July 20, 1938, "for the purpose of discussing plans regarding the insurance on the life of Martin M. Pearlman." The receiver replied to this letter stating that there had been "no change in the position of the bank as to its unwillingness to advance any further funds on this account", but he nevertheless attended the meeting and at it offered to sell the bank's interest in the policy to each of the creditors there present, or to the trustee. According to the stipulation of facts, he then claimed that the bank's interest in the policy was "its proportionate share of the cash surrender value thereof prior to the payment of the said premium of May 4, 1936." No one accepted his offer.

The trustee paid the premium which fell due immediately after this meeting (August 3, 1938) by obtaining a loan on the policy from the Sun Life Assurance Company, and thereafter annual premiums were paid

by the same means on March 6, 1939, March 1, 1940, and February 28, 1941. On March 11, 1941, Pearlman died and on May 14, following, the Sun Life Assurance Company of Canada paid to the trustee in settlement of the claim under the policy the face amount thereof less the total of the loans outstanding against it.

The question at issue is whether, on the above facts, the receiver is limited to the bank's pro rata share of the cash surrender value of the policy as of the time just prior to the payment of the 1936 premium, or whether, on behalf of the bank, he is entitled to his full pro rata share of the proceeds of the policy, less only the amount of his share of the premium which was paid by the other creditors, with interest. The court below answered this question in favor of the receiver and we agree.

In the court below, according to that court's memorandum opinion, the appellant's principal contention was that the agreement of all the creditors in 1934 to advance the arrearage of premiums then due, and the payment by them of their contributions according to their agreement, constituted a sale of the policy to the trustee as the representative of all the creditors, such sale being in accordance with the provisions of the trust agreement respecting sales of trust assets after an "event of default" by the debtor. The district court cut the ground from under this contention by saying that there was nothing in the facts to support the conclusion that there had been a sale of the policy and we regard that court's conclusion as sound.

The transaction of 1934 was a simple one. Pearlman having defaulted in his obligation to pay the premiums on his policy of life insurance as they fell due, the trustee was faced with the question of whether to pay the premiums himself and keep the policy in force or to fail to pay the premiums and let the policy lapse. Instead of choosing between these two alternatives himself he consulted with the creditors and they chose the alternative of keeping the policy in force and, to do so, advanced, or, to use the terminology of the stipulation of facts, "contributed", the necessary funds to the trustee. There is no hint or suggestion of a sale in this transaction. Since it appears to have been contemplated from the outset that all contributions would eventually be repaid, the transaction was simply a loan by the creditors to the trustee. As such the benefit thereby resulting—the continuance of the policy in force as an asset of the trust estate—enured to the trustee directly and to all of the creditors, his cestuis que trust, indirectly in proportion to their interests. The stipulated facts cannot be twisted into any other pattern.

The appellant's argument before us takes a somewhat different form. He now says that the creditors, being the only parties in interest, had the right to deal with the insurance policy as they saw fit, and that the action by all of them in 1934 was really a new agreement with respect to the policy. Thus he says the reinstated policy became an asset of the creditors not by virtue of the original trust agreement but solely because the creditors had entered into a new agreement with respect to it and had contributed their funds to pay the premium. Accordingly the trustee-appellant argues that the creditors, including the receiver's predecessor, in 1934 embarked upon a joint enterprise to continue the policy in force by putting up their own money to pay the premium. Then he says that the receiver, when he refused to contribute in 1936, in effect abandoned any further interest in the policy and withdrew from the joint adventure so that he is not now entitled to share in its maturity value since that value was realized only because the other creditors ventured their capital to keep the policy alive.

We admit that since the loan value of the policy was not sufficient to pay all of the premiums for the remainder of the life of the insured, the capital venture of the other creditors, as a matter of causation, kept the policy in force. But the answer to the trustee's contention in its present form is substantially the same as the answer to the contention made by him in the court below. It is, simply, that the stipulated facts fail to indicate that the creditors did anything more than to make a loan to the trustee as the trust agreement provided they could do.

To be sure under the terms of the trust agreement, an event of default having occurred, all the creditors acting in concert might have undertaken a joint adventure with respect to the insurance policy. Or they, or some of them, might have purchased it themselves directly, or the trustee might have purchased it himself to hold as the trustee for those creditors who wished to contribute to keep the policy in force. But they did none of these things as is in-

dicated by the fact that there was no assignment of the policy by Hardt as trustee under the trust agreement to himself or to any one else either individually or as trustee under some other agreement. It seems evident that the creditors who advanced their funds to pay the 1936 premium intended only to make a loan to the trustee so that he could keep it alive as an asset of the trust estate, not just as an asset of their own, and, this being so, nothing they alone could do, either by majority vote at a meeting or otherwise, could affect the interest of any other creditor acquired under the trust agreement.

In further support of his position the trustee argues that the receiver's offer in 1938 to sell his pro rata share of the cash surrender value of the policy as of the time just prior to the payment of the 1936 dividend, was an acknowledgment by him of the validity of the vote passed by a majority of the creditors at the 1936 meeting and tantamount to his consent to that arrangement. We cannot so construe the receiver's offer to sell out. The stipulated facts contain nothing to indicate why he wished to sell. He may have wished to sell to avoid future litigation, that is, as a form of compromise; he may have wished to speed the liquidation of his bank by collecting something on his claim against Pearlman immediately rather than waiting, possibly for many years, before collecting anything; he may, as the court below suggests, not have wished to gamble on the chance that the other creditors would maintain the policy in effect until the death of the insured; or he may, as the trustee argues, have in reality consented to the vote of the other creditors limiting his interest in the policy. Since we cannot say why, or even venture any inference as to why, the receiver offered to sell, we cannot draw any conclusion one way or another from that action on his part. Thus we need not consider whether a consent by the receiver to the action taken by the other creditors would amount to some sort of promissory estoppel as the trustee seems to argue.

One more matter remains for consideration.

After the decree was filed in the court below the trustee moved for a rehearing so that additional facts might be put in evidence in order to correct the decree. In this motion he said that an almost complete distribution of assets had been made and that as a result the decree as it stood was inequitable because, as a practical matter, it operated to give the receiver his full pro rata share in the net face value of the policy without any deduction for his pro rata share of the costs of administration. The court below denied the motion.

In his brief before us the appellee says that in the event that the judgment of the court below is sustained he is willing to pay his share of the fees and costs of administering the trust estate. Taking the appellee at his word, the question raised by the motion for rehearing does not require our consideration. If the decree below operates as the trustee says it does we have no doubt that the receiver will consent to its amendment and that the court below will make any amendment which may be agreed to.

The judgment of the District Court is affirmed with leave to the District Court to allow amendment of its decree in its discretion in accordance with the concession of counsel for the appellee.

